## Lyon v. The State Bank.

1. Though a Judge who is a party, or who is interested in a cause is not competent to try it, yet the defendant cannot object to his presiding at the trial by way of challenge or plea, for his interest, incompetency or bias.

2. A notice of motion for judgement issued by the Bank, identifying the debt claimed with reasonable certainty, is sufficient, though it has not the technical precision of a declaration.

3. Such notice may be served by the sheriff or a private person.

4. The certificate of the President of the Bank does not require more certainty. Its only object is to prove property in the Bank, but it does not establish the debt.

5. In this proceeding by motion, a declaration is not necessary, nor technical special pleading, though the record must shew every material fact to have been proven.

6. The act of 1823, incorporating the Bank of the State of Alabama, is constitutional.

7. Though the interest to be taken by the Bank is limited by statute to six per cent, yet there is no usury unless more than eight per cent be taken.

8. The rules of the Bank, whereby interest is taken in advance, and taking interest on renewals on the old and new note, both for the day of renewal, and also, calculating interest for a day as 1-360 part of a year, &c. are legal ; being sanctioned by universal banking usage.

9. A deposite in Bank by the principal, is subject only to the check of the person depositing, and cannot be pleaded by the security as a payment or set off.

10. In proceedings of this kind, though the notice is issued against three defendants, a motion and judgement may be against one only; and no discontinuance is necessary.

This was a suit commenced by the President and Directors of the Bank of the State of Alabama, in the County Court of Tuscaloosa county, by notice and motion against James G. Lyon, a security in a note discounted by said Bank.

The notice issued by the Bank was as follows:

"The sheriff of Washington county will serve and return this notice.

Bank of the State of Alabama, Tuscaloosa, June 15. 1827.

*To Wm. D. Gaines, Geo. W. Gaines and James G. Lyon :*

GENTLEMEN : You will be pleased to take notice, that the President and Directors of the Bank of the State of Alabama, will by their attorney, move the County Court to be holden for the county of Tuscaloosa, in the State

of Alabama, at the Court House of said county, on the JANUARY 1828.
second Monday in August next, for judgement and award
of execution against you, and each of you, on a note due        Lyon
from you to the said Bank, discounted on the fourteenth   The State Bank.
day of December, in the year 1825, for two hundred and
fifty dollars, payable to the President and Directors of
said Bank, ninety days after date thereof, and negotiable
in the said Bank ; when and where you may appear and
contest the claim if you think proper. In testimony
whereof I have hereunto set my hand, and affixed the
seal of the corporation.

    L.S.        B. B. FONTAINE, *President, &c.*
TEST, J. B. COOK, *Cashier."*

On which notice was the following return :

"Received and executed, 6th of July, 1827, on James
G. Lyon.  GEORGE W. MYERS, *Sheriff, Washington Co."*

At the August term of the County Court, the Attorney
General produced the notice, also the note sued on, and
the certificate of the President of the Bank, under the
seal of the corporation, as follows :

Dollars 250. Ninety days after date, we, William D.
Gaines as principal, James G. Lyon and George W.
Gaines as securities, jointly and severally promise to pay
to the President and Directors of the Bank of the State
of Alabama, or order, the sum of two hundred and fifty
dollars, payable and negotiable at said Bank, for value
received; dated at St Stephens, in the county of Washing-
ton, in the State of Alabama, the —— day of —— 1825.

                  WM. D. GAINES,
                  G. W. GAINES,
*Discounted 14th Dec. 1825.*   J. G. LYON."

"Bank of the State of Alabama, Tuscaloosa, August 9, 1827.

I do hereby certify that Wm. D. Gaines, George W.
Gaines, and James G. Lyon are indebted to the Presi-
dent and Directors of the Bank of the State of Alabama,
the sum of two hundred and eleven dollars, with interest
from the 15th day of June, 1826, on a note discounted
14th December, 1825 ; and that this debt is really and
*bona fide,* the property of the said Bank.

    L.S.        B. B. FONTAINE, *President."*

These papers being read, the plaintiff's counsel moved
for judgement against Lyon for the amount so certified
to be due.

The defendant, Lyon, appeared by his counsel, and objected to the competency of the Court to try the cause, by challenge; and assigned as the ground of challenge, that the presiding Judge of the Court, Thomas Owen, was from the date of the note till then, and yet was one of the Directors of the Bank; and therefore, incompetent to preside at the trial. The fact was admitted to be true, but the objection was overruled by the Court.

The defendant then moved to quash the proceedings for insufficiency of the notice, and want of proper proof of its service; and also objected to the sufficiency of the certificate as evidence of the debt. He also moved for judgement of *non pros* for want of a declaration; which several motions and objections were overruled by the Court.

The pleas of *nil debet*, *nul tiel* corporation, usury, set off and payment were then filed.

To the pleas of *nul tiel* corporation the plaintiffs replied specially, and to support this issue they relied on the act of the General Assembly, approved the 20th of December, 1823, entitled " an act to establish the Bank of the State of Alabama," and on a statement of facts agreed; which statement recited in detail all the proceedings which were had as required by the act, by which the transfer of all the different funds was made, stocks issued, &c.; the appointment of officers, &c. that all the requisites of the law had been complied with, and finally that the Bank having $171,322 90 in gold and silver in the vault, went into operation on the 9th of March, 1825, with a capital of $253,651 83½; to which evidence the defendant demurred, and prayed the opinion of the Court thereon.

The plea of usury set forth the following agreed facts, viz: " That the note was discounted the 14th of December, 1825, and at that time the Bank retained as discount $3 88; that on the 15th of March, 1826, W. D. Gaines paid as curtailment $39, and $3 27 as discount; that the mode of taking discounts by the Bank, is to retain at the time of discounting a note, interest by way of discount for ninety days, and three days of grace, exclusive of the day on which the note is discounted; on the whole amount for which the note is discounted; that it is the custom of the Bank in all cases to renew notes on the second day of grace, after the expiration of every ninety days, on the makers paying up the curtailments on all notes

falling due between the 1st of December and the 1st day

of June, at the rate of fifteen per cent; and between the 1st day of June and the 1st of December, at the rate of five per cent, together with the interest by way of discount for each ninety days, and the three days of grace; that interest by way of discount is reserved, including always the day on which the note is discounted, and on each day that the note is renewed; the interest taken is always inclusive on the first and last day. That it is the universal custom of the Bank to take discount at the rate of six per centum per annum for three hundred and seventy-two days in each year, and that all those customs and practices were applied in the case at bar, and formed part of the original agreement at the time of the loan in this case."

To this plea the plaintiffs demurred.

There was also submitted a statement of facts agreed, embracing all the facts in relation to the plea of *nul tiel* corporation, all the facts stated in the plea of usury; and besides it was therein admitted that on the 15th of June, 1826, there was a deposite made by W. D. Gaines of $15 29, which sum was placed to his individual credit on the books of the Bank, and still remained there to his credit at the time of trial.

The whole case being submitted to the decision of the County Court, the defendants' demurrer to the evidence on the plea of *nul tiel* corporation was overruled; the plaintiffs demurrer to the plea of usury sustained, and judgement was given for the plaintiffs on all the issues for $211 the debt claimed, and $14 as damages or interest for the detention.

Lyon brought the case to this Court and assigned the following errors: 1. The overruling of the challenge to the Court. 2. The overruling of the motion to quash the notice. 3. The overruling the objection of the defendant to the sufficiency of the certificate. 4. The refusal to sustain the defendant's motion for a *non pros.* 5. The judgement given on the issue on the plea of *nul tiel* corporation. 6. The sustaining the demurrer of the plaintiffs to the defendant's plea of usury. 7. That the Court erred in determining the law to be with the plaintiffs on the facts arising on the case agreed. 8. That the judgement was for too much. 9. That the Court proceeded to render judgement against the defendant, Lyon, when there was no discontinuance entered as to the other defendants.

JANUARY 1828.

Lyon
v.
The State Bank.

BARTON and STEWART, for the appellant. The first error assigned, that the Judge who tried the cause below was incompetent to adjudicate it, as standing in the double attitude of Judge and party, brings to the consideration of the Court one of the very fundamental principles of justice. The point as presented may appear somewhat novel at this day, as modern adjudications are fortunately rare on this subject, because probably a state of fact seldom occurs requiring its adjudication; but the principles on which the objection rests are as old as the law itself, and in other attitudes than here presented, from the ground of every day decisions in our Courts.

The great principle of justice "*that none can be a Judge in his own cause,*" [a] is one of so high obligation, that even the power of an express statute cannot violate it; not even that of the Parliament of England, although unfettered by a constitutional social compact and said to be almost omnipotent, can deprive the subject of its benefit; for it would be against "*common right,*" which the common law recognizes as a right superior to parliamentary enactments and control. [b] The principle exists in all codes of law and all countries, and cannot be denied in any Court, and never has been. No difficulty exists in its application in this cause; the plaintiffs are the President and Directors of the Bank, of whom the presiding Judge of the County Court was one, as well at the time of making the contract and breach of it as at the time of trial, when the plaintiffs sought their legal remedy to enforce payment. The Judge was sitting to enforce the payment of moneys which he was to receive and control as a Director; and in a suit brought in his Court by himself and co-Directors, and by his and their orders. The fact is admitted to be true, yet the Court has proceeded to render judgement in favor of himself and co-Directors.

The objection here is on five grounds, and on each of them the Judge was incompetent to try the cause. 1st. The Court being Judge and party. 2nd. Interest in the event of the suit. 3rd. Bias of mind and prejudice. 4th. Predetermination of the cause. 5th. Incompatibility of the duties of Director and of Judge.

In the organization of every judiciary system for the determination of individual rights and controversies, the most scrupulous regard has been had to the purity of the tribunals, so that the decisions may be pure. The law

a 4 Comyn's Dig
435. 8 Coke 234–5.

b Bonham's case,
8 Coke 134–5.
Co. Lit. 141. a

requires not only that they be so, but its policy is that they be beyond suspicion, so that all confidence may be reposed in them. The instruments provided by our law to obtain justice in Courts are, judges, jurors and witnesses; and each of those instruments should have this extreme purity, as each have an immediate action and power over the cause; and if any difference is to exist as to the degree of purity requisite in those three classes of instruments, it must be proportioned to the degree of power, control and influence each has on the determination of the cause. The greater and more immediate the control exercised, the more purity and disinterestedness is required. Evidently the judge has more power over the cause than a juror, and a juror more than a witness: therefore, greater qualifications are necessary and more the purity required in a juror than in a witness, and in a judge than in a juror. A false or interested witness is confronted with others, and his evidence is scanned by a jury and may be disproved: an interested juror is but one of twelve, and is under the control of the Judge; but an interested Judge is all powerful, particularly in matters of discretion, which form a great portion of his power. In this proportion and under this principle, the law has established its restrictions. A witness is competent, though father or son to a party, though biased, or prejudiced; though interested in the *question*, &c. Yet if even a witness have an *interest* in the suit, however small, or is a *party*, though nominal and without real interest, he would be rejected; and even such bias or prejudice as he may have, is left to the jury to be weighed by them in diminution of the force of his testimony. But any of those causes would wholly exclude a juror. How has the law provided, and what are sufficient objections as to him? Jurors must be *omni exceptione majores*; [a] all challenges for partiality, consanguinity or affinity, are sufficient. So if the juror be under the power of either party, or if counsel, tenant or servant to one of them; if he has declared his opinion touching the matter, or has been chosen arbitrator by one party, or is parishioner of the parish of which one party is parson, and the right of the church is involved; if he has done any act by which it appears he cannot be impartial, as if he has eaten or drank at the expense of either party, he may be challenged. [b] So if the juror's son has married the plaintiff's daughter; if

a 3 Bacon's Abr. 755.

b 3 Bacon 756.

he has previously given a verdict in the same cause; or if he has declared his opinion beforehand; if the action be brought by a corporation, and the juror is of kin to a member of it, he may be challenged. [a] In a case where a dean and chapter brought an assize, a juror being a brother to one of the prebendaries, was challenged. Challenges are allowed where the issue concerns a city or corporation, to any who are of the body, or of kin to any of them, though the corporation be not directly a party to the suit. [b] If there be in a juror the slightest suspicion or possibility of interest or bias, it is sufficient to exclude him. There are many cases where the most remote interest was held sufficient. In Wood against Stoddard, [c] which was an action *qui tam*, where half the penalty was given to the poor of a town, the inhabitants of the town were held incompetent jurors. It was there said that the relaxation of the rule as to interest had never been extended to jurors.

Now can there be any objection good as to a juror, which in principle does not apply with more force to a Judge, except so far as reasons of convenience may operate? Each pass in judgement, and the Judge does so with most power. How are Judges considered in this respect by our laws? By our constitution [d] the Judges are prohibited to hold any other office of trust or profit whatever. By statute, [e] the Judges of the County Court are prohibited from being engaged directly, or indirectly, as counsel in any case which may have been determined before them. When an attorney is appointed Judge of the County Court, any cause in which he was employed, must be removed to the Circuit Court. [f] The Judges are required by law to alternate, so as not to sit twice in the same county. [g] In the case of the Huntsville Bank, the Legislature required the Judges, so to alternate that a Judge should preside who was no wise interested, howsoever remotely in the Bank, either as counsel or otherwise. [h] A Judge of the County Courts is prohibited from appearing as counsel in any case for or against an executor, administrator, or guardian in the county of which he is Judge, or for or against any public officer of whom he has to take a bond. [i] No Judge sits in this Court in judgement, in a case where he has given an opinion or decision, or where he was of counsel to one party. It is said, a Judge should be as it were "*justice itself;*" [k] it is

---

JANUARY 1828.

Lyon
v.
The State Bank.
*a* 3 Bacon's Abr. 756, 757.

*b* 3 Bacon 756.

*c* 2 John. 194. 2 Caines 133. 19 John. 121. 1 John 316. 2 Salk. 398.

*d* Art. 5, Sec. 11.

*e* Act of 1821, Laws Ala. p. 27.

*f* Laws Ala. 204.

*g* Laws Ala. 166.

*h* Acts 1823, p.120

*i* Acts 1827, p. 30.

*k* 5 Jacob's Law. Dic: 549.

error if he give judgement in his own Court, in his own
cause, [a] and it is a misdemeanor for a Judge of an infe-
rior court to do so, for which an attachment lies. [b] An or-
der for the removal of a pauper from a parish was quash-
ed, because one of the justices who made the order, lived
in the parish, and was charged to the poor rate there. [c]
If there be an action in the Court of Mayor and Alder-
men on a by-law, where the penalty is given to the May-
or, it is error, though the Recorder only sits, and not the
Mayor; for it is the Mayor's Court. [d] If a Judge has an
interest, he or his deputy cannot sit. [e] If the Judge can
sit here, the eleven other Directors can as jurors.

It is said, the interest of the Judge here is merely
nominal; this is not strictly true.   An interest does exist,
and without pretending that any such influence operated
in the present case, or that there is even any suspicion of
it, we may say the inducement exists.   The Judge re-
ceives no salary, but fees in every case decided; it is his
interest, that as many. suits may be brought as possible
in his Court. If he do not please the Directory by his de-
cisions, they will be brought elsewhere; it is his interest
to split up discounts in small amounts, and to give them
to men not punctual, and to bring suits on all occasions.
But suppose there is no actual interest, can nothing but a
monied interest disqualify?  The pride of an opinion pre-
viously given, bias or prejudice, are sufficient objections.
This however, is immaterial, for if he have only a nominal
interest, he cannot sit. This is expressly decided in the case
reported in 12 Modern. [f] There a judgement rendered
in the Mayor's Court in favor of the Mayor and Com-
monalty of London, was reversed, though the Mayor
had no interest, and though in fact he did not sit himself,
but he appeared to be a nominal party, and it was held to
be error.

The objection that the Court had already prejudged
the cause, is also one of great weight; a Judge can never
sit in such case.   When the question arose before the
Board of Directors if suit should be commenced, it was
the duty of each Director to ascertain by examination of
the facts and law, if the  action would lie; else they
should not sue; and the determination that it should be
put in suit, is a decision according to the best lights and
investigation of the Director, that the cause of action is a
good one, and that there is not a sufficient defence to it;

Lyon
v.
The State Bank.
a 5 Jac. Law Dict.
550.
b 3 Comyn Dig.
336 1 Salk. 201,
396.
c 3 Bacon 800  4
Comyn Dig. 435.

d 4 Comyn Dig.
435.
e Ibid,

f pages 672, 674,
687.

it is a decision that Lyon was liable to pay the debt, and in Court it was only the same decision over again. The incompatibility of the offices of Director and of Judge, is also evident. As Judge, if there was any weak point in the cause of the plaintiffs, it was his duty to detect and expose it; as Director, it was his duty to conceal and remedy it. It is the duty of the Director to watch exclusively over, and promote the interest of the Bank; to advise with, counsel and direct the Bank's attorney; that of the Judge is to stand indifferent between the parties and counsel with none. Suppose the question be on a motion to continue, or for a new trial, how will he act? how can he divest himself of his duty as Director? He is sworn to perform two duties in direct opposition to each other; the two oaths bind to contrary and conflicting acts. Suppose the investigation and defence were to turn on some act of the Directors, some negligence on their part, or misconduct, by which the money was lost, and the Directors blameable, and perhaps personally liable; is one of the Directors a proper judge of this? And in th s very case, where the defence relied on is usury in the Directors, is one of those who committed it to judge of it? Who would be considered a good Director? One who would act and feel for the interest of the Bank, as for himself; one having those feelings for one party, cannot sit as Judge; he must stand indifferent. On the principle contended for, if the President of the Bank were the Judge, he could certify the debt as such, and be judge, party and witness. The only reason that can be urged why the objections to a Judge shall not be carried so far as those to a juror, is, that it would be inconvenient. The reason of convenience cannot prevail here to the complete overthrow of a fundamental principle of justice; a party can never be suffered to judge of his own acts.

It is said, that in general, a Judge cannot be challenged: let this be admitted as a general proposition; but what is the reason of it? It is because, in general, there is no proper *trior* of the challenge. It is a leading feature in this case, that the fact of the Judge being one of the plaintiffs, and a party, is admitted and shewn by the record. It needed no trial, and the reason does not apply. This is the great difficulty in most cases of this kind, where the fact is disputed and must be decided. Thus all the reasoning and objection to the challenge fails in this case,

We need not make a precedent for the benefit of other cases different from ours; the fact is broadly admitted, and we need go no farther. The principle stands as a bar to the validity of the judgement; it is in fact no legal judgement, but it is error. The record ascertains the fact, and the law fixes the consequence.

The second assignment is as to the sufficiency of the notice. Where the proceedings are summary, if no declaration is necessary, the notice stands in lieu of writ and declaration; it must therefore contain the essential requisites of both. The charge must be positive, certain and issuable, so that the defendant can plead to it; or if there be no plea, its truth, ascertained by a default, or by a demurrer, must be conclusive of such facts as will enable the Court to render a certain judgement, and the record must shew what are the facts that have been proven. The date of the note is not averred or set forth; it does not shew who was principal, nor who surety, nor for what amount the note was drawn; who it was made payable to, nor where dated, made or delivered; where nor by whom discounted, nor when due. It is averred to be made payable ninety days after date, but no date appears. It does not aver by whom it was made, but only states it was *due from them;* nor does it aver that the defendant was maker, security or endorser, or shew if he signed it at all or not, nor how much is due on it, nor how much they will move for. How can the defendant plead to such a notice *non est factum*, want of consideration, or other plea involving the identity of the note; or how could any issue be formed on it? The burthen of the issue must be on the plaintiff, but here the defendant in pleading must first make out a case for the plaintiff before he can answer to any thing tangible. Though the proceedings may be summary, the Court cannot safely act except on an issue framed with precision and certainty. The note is no part of the record; the act giving this summary proceeding does not require its production; the certificate of the President is sufficient, [a] and the note is only evidence. The words "discounted 14th December, 1825," are not part of the note, but only a memorandum of the Bank. The judgement must be rendered on the allegations of the notice; it must be so described as to protect a party from a second recovery on the same paper, and also so as to enable a security sued as such to recover from his

a Acts 1823, p.16.

principal.   Of what service would this record be to the
surety for this purpose, the note being no part of the
record?   The statute gives this remedy only on notes
made expressly negotiable in the Bank; the notice does
not aver it was such an one.   The statute requires that
the "*President*" of the Bank should make the motion, and
the notice given is that the "*President and Directors*" will.
In those proceedings, the utmost strictness must be used
in pursuing the statute, as the remedy is contrary to the
course of the common law.   The notice should have been
quashed.

The sheriff's return was not sufficient evidence of the
service of the notice thirty days before the motion day.
*a* Acts 1825, p.22. The act relied on *a* did not contemplate service of origi-
nal process, but only incidental notices where a suit is
pending.

The certificate of the President is subject to the same
objections as the notice.   It is the sole evidence neces-
sary by the statute, and therefore it must prove all the
facts with precision and certainty that are necessary to
be proved to obtain a recovery.   It must identify the
note, shew how the parties are liable, the date, amount,
when due, &c.   Suppose a new suit was instituted on a
note for $250, would this certificate shew that it had
been recovered?   The certificate is only for a debt of
$211, without explanation.   It applies as well to any other
note or book debt as to the one sued on.

The defendant below moved for a judgement of *non
pros* for want of a declaration.   There is nothing in the
charter to exempt the Bank from declaring regularly,
nothing to vary the course of the common law, except as
to the evidence required and time of obtaining judgement.
It must be admitted a party has a right to a full legal de-
fence.   How is he to plead and have a legal issue tried
if there is no legal statement of the plaintiff's claim?   By
statute, in *every suit* the plaintiff must file a declaration,
or his suit may be dismissed; it is imperative, and there
*b* Laws Ala. 476. is nothing to repeal it. *b*

The fifth assignment, that the Court erred in determin-
ing the plea of *nul tiel* corporation in favor of the Bank,
involves the constitutionality of the charter.   By the con-
*c* Laws Ala. 930. stitution, *a* it is required that " the remedy for collecting
debts shall be reciprocal for and against the Bank ;" so if
the charter does not secure this, it is unconstitutional and

void. What is meant by the remedy? It is the means
and mode of collecting. Parties must therefore have all
the means, mode and facilities against the Bank, which it
has against them. By the charter, the Bank may sue in
the county where it is located, and drag defendants there,
however remote their residence, to be tried by juries
under the immediate influence of the Bank and its Direc-
tors, and at great expense, where aged and infirm wit-
nesses, or females, can with difficulty, if at all, attend.
The charter secures no such rights to those to whom the
Bank may be indebted; they cannot sue in their own coun-
ties, but must go to the county where the Bank is located.
This is not reciprocity; if it is to be so construed, any
thing may be. Suppose the case to be between two
individuals, would it be said if one could sue the other
in his own county, and the other could not, that their
remedies were reciprocal? Certainly not. There can be
no difference because one is a corporation. The char-
ters of the Huntsville, Tombeckbe, and Mobile Banks
are very different in this respect; they may be sued in
any Court of record, and in them there is reciprocity in
this respect

Again, the mode of enforcing collections is not reci-
procal. The charter provides that the Bank may make
evidence for itself. The certificate of the President un-
der the seal of the Bank, is conclusive evidence of the
debt. But no such power is given to the individual who
sues the Bank; he must produce legal evidence. His asser-
tions, howsoever solemnly made, would not be listened to.
And it may be contended that the power given to the
Bank to make evidence for itself is against common right,
and if so, is void at *common law.* [a] The President of the <sub></sub> *a* 8 Coke, Dr.
Bank is made judge of the facts, exparte. Suppose the Bonhams case.
note is forged, but the President denies it, or is ignorant
of it; he will certify the debt to be due, and yet it is not.
Suppose the defendant is a security, and is exonerated by
the *laches* of the Bank, or is an endorser, to whom due no-
tice has not been given, or that the debt is barred by the
statute of limitations, or void for usury; if the Bank
claims it, the President will always certify, and thus
make evidence for himself. At all events, there is no re-
ciprocity in the remedy, as we can easily see by supposing
again the parties to be two individuals.

The sixth assignment brings to our consideration the

JANUARY 1828. question, was there usury in relation to this note? Usury consists in taking or securing by contract a greater rate of interest than the law allows, intentionally;[a] whether it be directly or indirectly. The charter of this Bank[b] provides that it may *discount* notes at a *rate of interest* not exceeding six per cent per annum; any contract by which more is secured is usurious. The general statute of usury of 1819,[c] does not disturb, but enforces our position. The first section of it applies only to persons, not to corporations or banks, and declares void, contracts for more than eight per cent; the second section imposes penalties for the taking of more than eight per cent; but the fourth section is general, and makes any note founded on a *usurious* contract void, independently of the particular rate taken. The word *usurious* is a general term, not confined to any particular rate. The legal rate of interest varies in different countries, and even in different transactions in the same country. Individuals are here allowed to take eight per cent, but banks only six, and it is usury in each to take more than the rate allowed by law to him. The usury law must be considered as applied to the charter which was afterwards passed, though at the reduced rate; the Bank is evidently restricted to six per cent, and it is unlawful if more is taken. Usury would avoid the contract at common law,[d] but the first branch of the fourth section of the statute of usury is general, and embraces all cases where too much interest is taken. It cannot be construed to relate to cases solely where more than eight per cent is taken, for the first section would completely effect this, and under such construction it would be completely inoperative and surplusage. There were at the time of the passage of the act three Banks incorporated in the State, all restricted to six per cent, and the fourth section was intended to operate on them and other such cases, else there was no usury law as to them. It is probable however, that penalties are recoverable only under the second section, and only where more than eight per cent is taken. There is a distinction in this respect between the accruing of a penalty and the nullity of a note.[e] The sixth section disqualifies Bank Directors from serving as such, who violate the act, and requires of them an oath that they will not violate it. It would be strange indeed (being allowed to take only six per cent,) if those guarantees are to operate

Margin notes:

Lyon
v.
The State Bank.

a 1 Call 81. 4 Randolph 412.
9 Mass. 49.
2 Cowen 769.

b Acts 1823, p. 5.

c Laws Ala. 444.

d 7 Bac. 187.
6 Comyn 480.

e 7 Bac. 211.
Dougl. 235.

only to prevent them from taking more than eight. This shews that the fourth section was intended to operate on all contracts where more interest was taken than was lawful, whether more than eight per cent or more than six per cent, according to the special case.

It is said, to constitute usury, there must be a corrupt agreement. The word "corrupt" is not to be found in any part of our usury statute, except in the second section, which provides for the recovery of penalties; but this word is not to be understood here in its full sense. It is not essential that there be an *intent* to commit usury, or to violate the law. If a party stipulates wilfully for more interest than the law allows, it not being by mistake or from the effect of involuntary miscalculation, it is usury; though he stipulates for what he believes he has a right to contract for, and does not know it to be usurious. It is the intentional contract as contradistinguished from mistake which makes it usurious. Therefore, where a party adopts an erroneous principle of calculation, and contracts under it, by which he receives more than is lawful, it is usury; although the lender does not know or believe it to be so. [a] Such is the case here.

What then are the rules of this Bank? What is their effect, and does the Bank by them stipulate for and intentionally receive more than six per cent interest? The Bank has adopted three false and usurious rules in relation to its discounts, and it is to be recollected that the record shews that those rules are understood as forming a part of the contract of loan

1. The interest or discount is taken and received in advance. This rule is usurious, for under it, usury to any extent may be practised with impunity; the usury will be greater in proportion to the time the loan is to continue, and it may be carried so far as to absorb almost all the principal. To illustrate this, suppose a note for $1000 be discounted for ten years at eight per cent per annum: the interest for ten years at eight per cent is $800: let it be deducted in advance, and the amount the borrower will receive is $200, for which the lender holds his note for $1000, to be repaid in ten years; which is equal to *forty* per cent per annum on the amount really loaned. It has been expressly held to be usury to receive the interest in advance in England, in the case of Barnes against Worlich; [b] and it is so in fact. It is true that in

JANUARY 1828.

Lyon
v.
The State Bank.

*a* 1 Call 81.
4 Rand. 412.
9 Mass. 49.
2 Cowen 769.

*b* Croke James 25.

some English cases it has been decided that in cases of paper of individuals *in the regular course of trade*, it is not usurious to receive interest in advance. This doctrine however, is very loose and indefinite; for admit the principle and the whole law of usury is gone. How will it or can it be qualified? For how many months, days or years may it be taken in advance, and how many not? What is usury and what not? If the Bank can discount notes at ninety days, it can for any other period of time. The uncertainty and indefiniteness of the rule is alone a sufficient objection to it to destroy it. But again, there is much difference between taking *interest* in advance and taking *discount*. The Bank charter allows the discounting of notes at a *rate of interest* not exceeding six per cent, not a *rate of discount*. The rules of discount and of interest, are distinct and very different in their effects. In this case the note was discounted the 14th December, 1825; it was payable in ninety days, and was for $250. The Bank retained $3 88, which was the interest on $250 for ninety-three days, under their rules; they consequently loaned only $246 12 Even if interest can be taken in advance, it should be only the interest on $246 12, which is $3 82. In relation to this rule, Chief Justice Savage, in the case of the Bank of Utica against Wager, [a] says the point must be considered settled in New York, that it is not usury, by the force of a previous decision; but if it were *res integra*, he should think it a palpable violation of the statute, and that to his mind it appears plain that it is so.

Again, it has been doubted if the interest is properly chargeable on the three days of grace. Those three days are said to be an *indulgence to the borrower*, and not a part of the contract. Would not a party be bound to receive the payment of a note bearing interest when due by its face, and could the lender refuse to receive the amount at that time because interest on the three days of grace was not also tendered?

2 The next false and usurious rule is, that in calculating interest on fractions of a year, it is charged as if a year contained only 360 days, and the law in this respect is disregarded. The borrower for ninety days use of the money, pays interest for one fourth of a year, or one and a half per cent, which should entitle him to the use of it for ninety-one days and about a fourth; but the law rejects

the fraction, say ninety-one days. By this operation, four times repeated in the year, the borrower pays six per cent, that is, interest for 365 days, but for this price he gets it only 360 days, and loses five days. The law is peremptory, the rate shall be *per annum;* yet the Bank disregards this, and charges a years interest for what is not a year. The law has said what shall be the rate per year, and has clearly defined what a year is, for in law a year is well established to be 365 days; a half year 182; and a fourth 91; rejecting all fractions. It has further provided that no regulation or by-law shall be established by the Bank contrary to the laws of the State; [a] and it is well settled that no usage of bankers, merchants, or any one else, shall control the law of the land; yet the Bank effects all this notwithstanding, and receives the benefit.

In the case of the New-York Firemen Insurance Company against Ely and Parsons, [b] this mode of computation was elaborately examined and argued, and it was solemnly adjudged by the Supreme Court to be usurious, and the note was declared void on account of it. In the case of the Bank of Utica against Wager, [c] the same was decided. It is believed no case can be found to the contrary.

3. The third rule of the Bank by which usury is taken, is that by which a mode of curtailment is adopted, which is fictitiously called a *renewal.* The original contract is, that the note shall become due in ninety days; three days of grace are allowed, so the payment is due the ninety-third day ; but a curtailment is paid, and on the second day of grace, by a fiction, the note is supposed to be renewed for the balance ; it is considered as a new note again discounted to pay the old one, and interest again commences on it from that day as on a new note, so that on the second and third days of grace, interest is paid on the old note, and on the new one likewise ; for those two days, interest at the rate of twelve per cent is taken on the loan. The borrower has but one benefit of the money, and in fact, there is no new note at all ; it is all done on the same identical original paper first discounted, and on which the money was loaned, and it is all a fiction by which usury is taken. Again, the rule of law is, that in computing time and interest, one day is to be included, and the other excluded; but the Bank computes interest on the first and

*Margin notes:*

JANUARY 1828.

Lyon
v.
The State Bank.

*a* Acts 1823, p. 7.

*b* 2 Cowen 678.

*c* 2 Cowen 712.

58

last days, both inclusive.   By this rule, an individual pays interest for three hundred and seventy two days in each year, instead of three hundred and sixty five.   If such a rule can be sanctioned, the law of usury is again exploded ; for if the Bank can require such renewal every ninety days, and apply this rule, it can require it every thirty, every ten, or every five days, and so receive interest twice for every day of the year ; and by this rule alone, without the aid of the others, can obtain twelve per cent instead of six.

Much difficulty has occurred in cases where there was really a renewal in fact, in the discounting of accommodation paper.   In such cases, on account of the actual disconnexion of the two contracts, and the impossibility to connect them, it was determined there was no usury, although interest was twice paid.   In the case of the Bank of Utica against Wager, [a] it is so laid down ; but it is said that if it appeared there was an *agreement* upon the first loan, *express* or *implied*, that such renewals should be made, it would be otherwise    In the case of the Maine Bank against Butts, [b] the same doctrine is maintained. A new trial was granted because it appeared that more than six per cent was taken in this manner ; the Court say it is immaterial if it be taken in one contract, or in two, each is liable to be avoided, although it appeared in that case the charter authorized taking interest *on banking principles*, which is not the case here.   The Court gave no weight to this expression, and condemned all rules by which more than legal interest was taken.   In the case now before the Court, the contract is express, that the renewal shall be so made ; the original note is the one sued on, and in fact there never was a new note, a new discount, nor any other contract but the first one.   The record shews that the loan was made to be governed by said rule, and that it was a part of the original contract.

The proper mode of casting interest on curtailments is fixed by the statute of 1811. [a]   It provides that when partial payments are made on contracts for the payment of money, the interest accrued shall be first credited, and the *balance* placed to the payment of the principal.   This statute is general ; there is nothing in the Bank charter varying its effect.   It governs this contract, and cannot be avoided or evaded by any one.   The curtailment must be truly applied according to its provisions.

Let us now examine the effect of these several rules, and see what interest is in fact taken by the Bank, and what is properly due by law. The loan is to be considered as for one year, for this is in fact the contract. Let us suppose a note for $1,000, discounted on the first of January, nothing being lost, the curtailments regularly paid, and the note fully discharged at the end of the year, according to the rules of the Bank.

| | | |
|---|---:|---:|
| Note for $1000 at ninety days, discounted 1st January, | $1000 | 00 |
| Ninety-three days interest retained in advance, | 15 | 50 |
| Amount actually loaned 1st January, | 984 | 50 |

The note falls due 31st March, three days grace run to the 3d April. It is renewed the 2d April for $850.

| | | |
|---|---:|---:|
| On the 3d of April the borrower pays curtailment, | 150 | 00 |
| Interest in advance ninety-three days on note for 850, | 13 | 18 |

In all paid 3d April, 163 18.

The note falls due again 30th June, and runs to 3d July. It is renewed 2d July for 800.

| | | |
|---|---:|---:|
| On the 3d July borrower pays curtailment, | 50 | 00 |
| Interest in advance ninety-three days on 800, | 12 | 40 |

Amount paid 3d July 62 40

Note due again 29th September and runs to 2d October. Renewed the 1st of October for 750.

| | | |
|---|---:|---:|
| On the 2d October borrower pays curtailment, | 50 | 00 |
| Interest in advance ninety-three days on 750, | 11 | 63 |

Amount paid 2d October, 61 63.

| | | |
|---|---:|---:|
| January 1st, balance paid in full, | 750 | 00 |
| Total paid, | 1037 | 21 |

### Computation of the same by the statute.

| | | |
|---|---:|---:|
| Amount loaned 1st January, | $984 | 50 |

| | | | |
|---|---:|---:|---:|
| Interest on 984 50 from 1st January to 3d April, ninety-two days, | 14 | 89 | |
| Add to principal, | 984 | 50 | |
| | 999 | 39 | |
| Deduct partial payment 3d April, | 163 | 18 | |
| Balance due 3d April, | | | 836 21 |
| Interest on 836 21 from 3d April to 3d July, ninety-one days, | 12 | 51 | |
| Add principal, | 836 | 21 | |
| | 848 | 72 | |
| Deduct partial payment 3d July, | 62 | 40 | |
| Balance due 3d July, | | | 786 32 |

JANUARY 1828.

Lyon
v.
The State Bank.

| | | |
|---|---:|---:|
| Interest on 786 32 from 3d July to 2d October, ninety-one days, | 11 76 | |
| Add principal, | 786 32 | |
| | 798 08 | |
| Deduct partial payment 2d October, | 61 63 | |
| Balance due 2d October, | | 736 45 |
| The above balance, | 736 45 | |
| Interest on do from 2d October till 1st January, ninety-one days. | 11 02 | |
| The balance due the 1st January is, | $747 47 | |

By the Bank rules, the interest received is $52 71, and by the statutory rule it is $50 18. The excess received is $2 53, equal to 6, 30-100 per cent. In every dollar of interest taken by the Bank, they take four and eight-tenth cents too much, and therefore of usury. It is to be observed that this is according to the statutory mode of calculation, which pays the interest quarterly, and is the established legal mode; but if the mercantile rule was used, debiting the interest on the principal and crediting it on the curtailments, the difference would be much greater, the excess would be $3 75 equal to 6, 46-100 per cent according to that rule.

What authority has the Bank to receive this excess? and how stand the authorities? By the authority in Cro. Jac. referred to, [a] the taking interest in advance is held usurious. In Fleckner against the United States' Bank, [b] and in the cases in Cowen, [c] it is held otherwise; in the last because not there *res integra;* here it is *res integra;* the old authority is true in principle, and therefore the best. As to the other rules, the cases in Cowen and in Massachusetts decide them expressly in our favor, and no authority can be produced to the contrary. If therefore on authority, there is any doubt as to the first, there is none as to the last points. How stands the case upon principle? It must be admitted that more than six per cent is taken, and how is it attempted to be justified? It is said it is sanctioned by usage; but it is one of the best settled principles of the law, that usage can never prevail where the law is clear, else any unlawful practice may, by being often repeated, repeal the law; the very violation of the law becomes the authority for it. [d] Banks are not more privileged than individuals in this respect, nor in taking improper interest. [e]

What would be the effect of sustaining such rules? If the State Bank can, so can the Mobile Bank, and every

*a* Page 25.
*b* 8 Wheat. 338.
*c* 2 Cowen 712,678

*d* 2 Cowen 707.
Cro. Elis. 85.
Peak N P. Cas.
202 4 Ves 678.
Ord. on Usury
59, b. 4 T.R.750
*e* 9 Mass. 54.

JANUARY 1828.

Lyon
v.
The State Bank.

other Bank, or individual loaning money.   The exces-
sive interest taken by the State Bank alone, amounts to
a large sum.    The capital of the Bank is $389,000, and
is rapidly increasing; it can issue notes to double the
amount of its capital, making in all $1,167,000, of funds
for discount; the excessive interest taken on this amount
above what is lawful, is $3,501 per annum; which in a
few years will be doubled and tripled.  The Bank of Mo-
bile with a capital of $500,000, and the power to issue
three times that amount of paper, can under those rules
raise $6,000 per year, over six per cent, and thereby the
people of the State can be taxed to an immense amount of
interest, without the sanction of the law.    This certainly
is not within the rule of law *de minimis non curat lex.*

Under the seventh assignment, all the foregoi-·g argu-
ment applies under a different principle.   Suppose the
contract not to be usurious, yet the note is void on the
principle that it was an *illegal contract*; the consequence
of which would be, that the security is void, and the mo-
ney loaned can only be recovered as money had and re-
ceived.   Corporations are creatures of the law, and have
only such powers as are given them. [a] The charter says
it shall be a *fundamental* rule of the Bank, that not more
than six per cent shall be taken.   There is a want of
power to make a valid contract for more.   Suppose a con-
tract was entered into in so many words, that six and a
third per cent should be paid for interest.   Could it be
sustained under the charter?   Is there more than one con-
tract made here, and does it not secure such interest?   Is
it not in effect precisely the same thing?   It is well set-
tled in all the books, that where a security is taken, found-
ed on a contract or consideration which is unlawful, im-
moral or contrary to public policy, it is void.    It is void
even if the consideration be unlawful in part only. [b] Courts
of Justice sit only to enforce lawful contracts, not unlaw-
ful ones.

The ninth assignment is founded on the foregoing ar-
guments, and also on the fact that there was a deposite in
Bank of $15 29, made by W. D. Gaines, the principal in
the note, before suit was brought; and which should have
been allowed under the plea of set-off, or payment.   The
law favors securities always, and Lyon, under this
principle, is entitled to the benefit of that payment.   If
after the default of W. D. Gaines to pay his note, he had .

a 2 Cowen 664,
ante p. 299.

b 1 Esp. N. P.
183, 185. 3 T.R.
17, 193, 20, 22.
4 T. R. 561. 4
Dallas 298.

JANUARY 1828.

Lyon
v.
The State Bank.

*a* Minor's Ala. R.
321.

*b* Laws Ala. 449.

sued the Bank for the amount of a deposite made, could not the Bank set up his protested note as a defence against him? If so, they have a right to apply the deposite as a payment, and the security has a right as he is favored, to plead it as a set-off. " This suit was brought as well against Gaines as Lyon, it is joint.

Lastly, there was error in proceeding in a joint action against three, to judgement against one only. At common law there could be no discontinuance; by our statute there may; *b* perhaps the statute does not properly embrace such cases as this, but at all events there has in fact been no discontinuance here; there must appear an express discontinuance, or it is error.

PERKINS, Attorney General, for the defendants in error, cited in his argument, Acts of 1823, p. 1, &c.; Acts of 1826, p. 22; Laws Ala. 444–5, 930; Acts 1824, p. 25; 8 Wheat. 338; 4 D. and E. 152–4; 6 D. and E. 123; 2 Cowen 704, 723, 763   Only a small portion of the argument made by Mr Perkins is preserved and on file; it is omitted for this reason.

JUDGE SAFFOLD delivered the opinion of the Court.

ON the trial of this cause a variety of objections were made by the then defendant's counsel, all which are presented for the consideration of this Court on bills of exceptions.

Several exceptions taken below and assigned for error here, are believed to be highly important in principle, and have received the deliberate consideration of this Court, aided by the arguments of eminent counsel.  An exception which appeared to involve intrinsic difficulty, relates to the competency of the Judge; he being at the time a Director of the Bank in whose favor the suit was instituted.   This is embraced by the first assignment of error, viz : That the Court erred in overruling the challenge of the defendant to the competency of the Court, and in proceeding to adjudicate the cause.

It is admitted by the record that the Judge was one of the Directors of the Bank.   The objection was made in the form of a challenge to his competency.   The President and Directors being an incorporated body, sued, as they were authorized to do, in their corporate style and capacity.   The fact is well understood and admitted, that

the Bank is exclusively a State institution, no Director or other person having any individual interest therein. Nor is the Judge a party, otherwise than as one of the thirteen persons constituting the body politic; which does not, without extrinsic evidence, shew the natural persons composing it, so as necessarily to identify him as a party of record. Hence, the objection of *mere apparent* inconsistency does not apply. Yet if the true situation of the Judge legally disqualified him for the adjudication, the covert character in which he and others were authorized to sue, could not sanctify the proceeding.

The boundary of judicial competency does not appear to be as well defined as the importance of it would presuppose, nor is the method of taking the exception, where it justly exists. It is however believed to be a well established principle of law, "that a Judge ought not to adjudicate in his own cause, or in pleas where he is a party." [a] " A judgement given by a Judge who is a party in the suit with another, and so entered of record, is error, although several other Judges sit there and give judgement for the Judge who is a party." [b] " Where a Judge has an interest, he cannot determine a cause or sit in Court; and if he does, a prohibition lies." [c]

But it is also said, "a Judge shall not be generally excepted against or challenged; or have any action brought against him for what he does as Judge." [d] A case is reported in the old books and may be found in 12 *Modern*, where a judgement rendered by the Mayor and Aldermen of London, in favor of the Mayor and Commonalty, was reversed in the appellate Court for the incompetency of the Mayor to adjudicate the case in which he was a party. In that case, as in this, it did not appear that the judicial officer had any private interest in the judgement; yet at least one important distinction exists between the two cases. In the case of the Mayor, the same officer with precisely the same title, must necessarily have appeared as one of the plaintiffs, and judge of the cause; and must have been by the ordinary proceedings identified as the same person; so that the fact could be, and was presented to the notice of the appellate tribunal, without the anomaly of addressing an objection to the presiding officer, which related personally to himself.

The counsel for the plaintiff in error has urged the application of the same doctrine of challenge to jurors and

a 8 Coke's R 118.

b Jenk. 90, pl. 74.
c Hard. 503, See Jac. Law Dic. title Judges.

d 1 Inst. 294. 2 Inst. 422.

JANUARY 1828.

Lyon
v.
The State Bank.

a 3 Bac. 266. 19
Johns. 121.

Judge, that they must be *omni exceptione majores.* <sup>a</sup> The cases referred to relate exclusively to jurors. Could it be shewn that the same exceptions apply equally to Judges, and that there is a practicable method for making the objection on trial, I should incline to the opinion that this exception to the competency of the Judge ought to prevail. The letter and spirit of the law, the dignity of the State, and reputation of the judiciary, demand purity in the arbiters, and impartiality in the administration of justice ; and if any distinction is to be drawn, it is more important that the Judge should be impartial than any juror should, because of his greater authority and influence. It cannot however escape observation, that many cases legally disqualify jurors, which do not in legal contemplation affect Judges; among which may be mentioned, the formation of a previous opinion, former adjudication of the same case, remote relationship. Perhaps the reason of the law for this difference may be founded on the inconvenience of procuring at all times, Judges who are entirely indifferent; the presumption that their professional acquirements or official avocations leave them less liable to extraneous influence; their great hazard from aberration of duty; together with the fact, that their decisions are more accessible to public animadversion, legal scrutiny and correction. The power and influence of a sole presiding Judge, is confessedly great but his decisions being generally subject to revision, there is a prospect of correction in case of error. If the decision be correct, justice is indifferent to the private wishes of the Judge. If the Judge be corrupt or grossly ignorant, he is responsible to the State, perhaps to the party aggrieved. These are some of the barriers on which the law relies for the restraint of Judges against the improper exercise of their authority. I would not be understood to say these are all, for should a Judge or justice evince an intention to try a cause under circumstances creating obvious objections, I should hope some method could be discovered to arrest his course. Or if he shall have tried the cause, and decided erroneously or corruptly, and the party cannot be relieved by the ordinary appeal, I trust he may find (besides the responsibility of the Judge) relief in the chancery or executive as the case may be. But as cases of this kind are now scarcely to be found, except in the annals of remote history, I have already

JANUARY 1828.

Lyon
v.
The State Bank.

dwelt too long on the subject. One insuperable objec-tion in the opinion of this Court, against the right to challenge a Judge in his own Court, is, that there can be no adequate tribunal to hear and determine the challenge. The Judge is incompetent to try his own competency, or to ascertain the facts on which the question of competency depends. Another, and we believe not a slight objection to the course would be, that if the right be admitted, the Courts are subjected to frequent annoyance of the most disagreeable kind, and their authority weakened and abused by frivolous or imaginary objections to the person of the Judge. Where it must appear to the appellate court as matter of course from the record, without objections made or evidence introduced in the Court below, that the Judge is a party or interested, as in the case of the Mayor of London, the difficulties as stated, to allowing the exception, do not apply ; and perhaps a stronger objection to the challenge than any other, is, that after much research by the vigilant counsel concerned, as well as the Court, no precedent for it has been found in England or the United States. Whether under the circumstances of this case, it was legal and proper that this Judge should have tried the cause, we do not now express any opinion ; but we decide that the exception was not available as matter of defence to the action, either by challenge or plea.

The second assignment is, that the Court erred in overruling the defendant's motion to quash the notice.

The charter in prescribing the mode of collecting the debts of the Bank, provides, that it "shall be lawful for the President of the Bank, after having given thirty days notice thereof, to move the Circuit Court of the county where said Bank may be established, on producing to said Court before whom the motion is made, the certificate of the President of the Bank, that the debt is really and *bona fide* the property of said Bank, for judgement ; and all debts due by the said Bank, by bond, bill, note or otherwise to any individual, or body corporate, may be sued for and recovered in like manner." A subsequent act gives concurrent jurisdiction to the County Court.

The notice was signed by the President, with the seal of the corporation affixed thereto, and was attested by the Cashier. It was addressed to the defendant in the mo-

tion and the two other joint promissors, notifying them that the motion would be made at the particular Court, for judgement and award of execution against them and each of them, on a note due from them to said Bank, discounted on the 14th day of December, 1825, for two hundred and fifty dollars, payable to the President, &c. negotiable at said Bank; when and where they might appear and contest the claim. A notice in writing which so far identifies the debt for which judgement will be moved, as to afford reasonable certainty, is deemed sufficient. This we would hold necessary though the charter does not prescribe the requisites, or expressly require it to be in writing. The notice may be given by a private person, who will prove the service, or by the sheriff, as was done in this case. It is part of the evidence necessary to sustain the motion. This notice is believed to have been sufficient.

Third assignment, That the certificate is equally defective in not identifying the paper sued on. The amount of the note is larger than the sum mentioned in the certificate as then remaining due. It is known to be nothing unusual for debtors to make partial payments, and the history of the country may well inform us, if material, that debts in this Bank are usually reduced several times by curtailments, before extinguished. The sum mentioned in the certificate, is not expressed as the original amount of the note, but as the amount of the debt at that time. If the debt claimed in the notice and motion did not correspond with that described in the certificate, it being subject to resistance or explanation by other evidence, the motion could have been successfully resisted. The entire object of the certificate is conceived to be, to ascertain the title of the Bank to the debt moved for, and to prevent the Bank from collecting other debts by the summary process. For this purpose it is deemed sufficient.

Fourth assignment, That the Court refused to sustain the motion of defendant for a *non pros*, is understood to refer to the absence of a declaration. This was unnecessary. The charter authorises the proceeding by motion, on the note and certificate, and by necessary implication dispenses with special pleading and all technicality. But it requires by legal construction, in lieu thereof, that the record shall shew every material fact to have

been proven, whether the judgement be by default or
otherwise.

The fifth assignment is, That the Court erred in over-
ruling the plea of *nul tiel* corporation.  Under this assign-
ment it is contended that the charter is unconstitutional,
on the ground that the remedy for and against the Bank
is not reciprocal, that all debtors must be sued in the
county in which the Bank is, and that the President is
authorized by the charter to create a certificate to be
used as evidence in its favor.  A correct interpretation
of the language of the constitution that "the remedy for
collecting debts shall be reciprocal for and against the
Bank," is believed to be, that the remedy for and against
it shall be equally *summary*, on like notice and evidence,
and in the same form.  The provision in the charter that
all motions for and against the Bank are to be made in
the county where it is situated, may or may not be equally
convenient to each party ; something may depend on the
residence of the party opposed to the Bank.  But this
trivial and contingent convenience is not believed to be
embraced by the constitution.  Besides, it is to be ob-
served that this privilege only extends to contracts in
favor of the Bank, which contain an express stipulation,
that they shall be *negotiable and payable at the Bank*, and
the charter is to be regarded as the authority for making
such contracts, and as forming part of them, to which
neither party can object.  The certificate required on the
part of the Bank is an additional requisite *against* it, de-
signed merely to ascertain the Bank's interest in the debt,
and does not dispense with any proof which would other-
wise be necessary.  It cannot supersede the necessity of
producing the original evidence of the debt, or in any
thing prevail against it.  It may contain an admission of
credits against the Bank.  For these purposes the certifi-
cate cannot prejudice the defendant, but rather protect
him.

The sixth assignment is, That the Court sustained the
demurrer to the defendant's plea of usury.  With respect
to any rate of interest not exceeding *eight per cent*, the law
is the same as if the act of 1819, regulating tho rate of in-
terest, did not exist.  That act cannot affect any contracts
except such as reserve a higher rate than eight per cent.
Nor is there any statute that can operate on this contract,
except the charter of the Bank, inasmuch as the interest

JANUARY 1828.  reserved is admitted by the plea to have been less than the rate of eight per cent. The charter authorizes the Bank to deal in bills of exchange and discount notes at a rate of interest not exceeding *six per cent per annum*. It does not declare an excess usurious, or what would be the effect of such contract; consequently it cannot be adjudged usurious. On this point several authorities were relied on by the counsel on each side, some of which will be more particularly noticed under the next which is a kindred exception.

*Lyon*
*v.*
*The State Bank.*

The seventh assignment insists, "That the Court erred in determining the law to be in favor of the plaintiffs, on the several facts arising on the agreed case."

The facts thus agreed in substance are, that at the time of discounting the note, the Bank retained interest by way of discount for ninety days, and three days of grace, exclusive of the day on which the discount was allowed, on the whole amount for which the note was discounted. On the second day of grace, the note was virtually renewed according to the custom of the Bank, not by the actual substitution of a new note, but by paying the usual curtailment, together with the interest by way of discount for the succeeding ninety days, and three days of grace thereafter; whereby interest by way of discount was reserved for the day on which the note was discounted, as well as the day on which it was thus renewed, and that this course is consistent with the universal custom of the Bank, which is to take discount at the rate of *six per cent per annum* for three hundred and seventy-two days in each year, and that these customs and practices formed part of the original agreement. It is also agreed that a small sum of money remained in Bank as a *deposite* by W. D. Gaines at the time of the issuance of the notice.

In states where the statutes have limited the legal interest generally at the same rate with the Bank discounts, and have declared any higher rate usury, or the contract void, we admit that the question might be materially different.[a] But I should think the principle by no means clear, that under the circumstances of this case, the contract would be usurious or otherwise void for illegality.

*a* 6 Comyn Dig. 480. 1 Call. 69. 2 Cowen.

The illegality is supposed to consist in taking the discount at the rate of *six per cent*, in advance, and calculating the same including the days of grace, for two days longer than the forbearance allowed between the renew-

als as required.  The practice of retaining the discount in advance, under similar circumstances, has been established by a long course of banking usage ; and had received the sanction of the supreme tribunal of the Union before the granting of this charter, and the right may there-fore be supposed to have entered into the spirit and intention of it.  In the case of Fleckner against the United States' Bank, [a] the Supreme Court says, "the practice of taking bank discounts in advance is believed to be universal, and probably few if any charters, contain an express provision, authorizing in terms the deduction of the interest in advance, upon making loans or discounts.  It has always been supposed, that an authority to discount or make discounts did, from the very force of the terms, necessarily include an authority to take interest in advance.  And this is not only the settled opinion among professional and commercial men, but stands approved by the soundest principles of legal construction ; indeed we do not know in what other sense the word discount is to be interpreted.  Even in England, where no statute authorises bankers to make discounts, it has been solemnly adjudged, that the taking of interest in advance by bankers, upon loans in the ordinary course of business, is not usurious."  But it is contended that the language of this charter is different ; that it only authorizes the Bank to discount at a rate of *interest* not exceeding *six per cent per annum*, and does not authorize it to discount paper at the same rate of *discount*.  This appears to be a refinement that cannot be sustained.  It is the import of the verb "to discount," connected with the nature of banking transactions, that confers the right to retain the premium in advance, and it can be nothing else than *interest in the way of discount*.  With respect to the additional days beyond the actual loan, it is to be observed, that if the debtor did not prefer other terms, he was at liberty to extinguish the debt on the last day of grace, which would remove all the objections except that the day of discounting as well as the last day of grace, are both included in the computation.  This objection, from the effect produced, would seem to fall within the influence of the maxim *de minimus non curat lex :* when too it is found consistent with the general usage of banks, as is believed to be the fact, and that the necessity of it results from the policy of discounting for ninety days, which is more

[a] 8 Wheaton 354.

JANUARY 1828.

Lyon
v.
The State Bank.

convenient to borrowers than a shorter time, the objection would seem to occupy narrow ground. The necessity of having regular meetings of the board for the purpose of discounting at stated periods, and that these should be on the same fixed day of the week, is dictated by many considerations. It is impracticable, in the computation of time, to divide the year into equal quarters, and have this stated discount day always on the last day of grace, for notes previously discounted. Hence this banking usage is found convenient and necessary to enable debtors to obtain the benefit of renewal, in preference to paying off their debts on the next day. It may in fact be viewed as the virtual provision of a fund by the debtor, a day or two in advance, to meet his debt at maturity ; and is not by us considered an illegality affecting the validity of the contract.

Eighth assignment. The judgement was for more than the law allows. This is already answered, except as to the deposite. A deposite is not applicable to any payment, or available as a set off against the Bank, without a check, or other authority directing it, by the person in whose favor it exists, which was not here given.

Ninth assignment. Error in proceeding to judgement against Lyon, till a discontinuance had been entered as to the other defendants. A proceeding by motion, on notice, is essentially different in this respect, from a common law suit. In this form, the notice is no part of the record, but evidence only. If not served or not proceeded on, it is a nullity. An alias could not issue on it, nor would a discontinuance be necessary to authorize a proceeding *de novo*. The motion recognized only the person notified as a party defendant. No express discontinuance was necessary.

Judgement affirmed.

THE CHIEF JUSTICE not sitting.

---

NOTE. On the point relative to the mode of taking advantage of the incompetency of the Judge below, the counsel for the appellant prayed a rehearing; stating that this question had not been pressed in argument, as it was supposed by them not properly raised, and of no serious difficulty under the admission made in the record. They urged that the remedy by prohibition could not in this case and many others be applied. In suits instituted by the Bank, the remedy is peculiar; the defendant below in those cases can have no opportunity to procure a prohibition. It is to be observed that the notice is issued by the

Bank, and not by the Court or its clerk; it is an act in *pais*. The first
act of the Court is the hearing of the motion; it is then only that the
Court is called upon to act, and if the Judge will act, there is no remedy.        Lyon
If an application were made to a Circuit Judge for a prohibition, it               v.
would be a sufficient answer to say "we will not presume prematurely      The State Bank.
that the Judge will violate the law and sit in his own cause.  True, a
notice has issued, but we are bound to presume the Court will not
hear the motion; the Court has yet done no act shewing that it would."
A prohibition does not lie before appearance to a suit below. *a*                *a* 2 Sellon 312.

No plea in this case would lie to the jurisdiction of the Court; the
Court has jurisdiction; the objection is personal to the Judge    It is
believed that in all the cases where prohibitions have been awarded,
there was a want of jurisdiction in the inferior Court    After sentence
no prohibition lies, except where the want of jurisdiction in the Court
below appears of record. *b*  Where a difficulty arises at the trial only,   *b* Salk. 548.
there is no opportunity for a prohibition.   Suppose a Judge of the      Comyn's Dig.
County Court should refuse to transfer a suit in which he was counsel   title prohibition.
to the Circuit Court as the sta ute directs, but should proceed to try
it; is the remed by prohibition?  How could it be obtained?  There is
no want of jurisdiction in the Court.  If it appear of record that a mo-
tion to transfer the cause was made and overruled, would it not be
error ?   Again, suppose the case in a circuit Court of a motion made
against a sheriff in favor of the presiding Judge, or in a case wherein
he was interested, for failing to pay over money collected on an exe-
cution, on one day's notice under the statute; or the case of a motion
against a co-security as given by statute, and the Judge should ersist
in sitting; no single Judge could grant a prohibition, and the Supreme
Court is not in session.   A prohibition cannot be obtained, and Judge-
ment will be rendered   If the facts appear of record, will not the
judgement be reversed for error?  If again, when a prohibition has
issued, the Judge refuses to obey it but proceeds to give judgement;
is such judgement valid?  True, he may be attached for a contempt,
but in all those cases, is not the judgement rendered void, and rever-
sible on error?  If not, there are a great variety of cases where there
is no remedy at all at law.

The Court upon consideration were satisfied with the opinion de-
livered, and the motion for rehearing was denied.